IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                              :
CHERYL DENISCO, et al.,       :
                              :        Civil No. 10-3612 (JBS/AMD)
              Plaintiffs,     :
                              :
       v.                     :
                              :              OPINION
BOARDWALK REGENCY CORP.       :
d/b/a CAESAR'S ATLANTIC       :
CITY, et al.                  :
                              :
                              :
              Defendants.     :
                              :
```

APPEARANCES:

Edith A. Pearce, Esq.
Rebecca L. Thomas, Esq.
THE PEARCE LAW FIRM
1429 Walnut Street, 14th Floor
Philadelphia, PA 19102
     Attorneys for Plaintiffs

Christopher C. Mauro, Esq.
CAMACHO MAURO MULHOLLAND, LLP
350 Fifth Avenue, Suite 5101
New York, NY 10118
       - and-
Reena Shah, Esq.
CAMACHO MAURO MULHOLLAND, LLP
12 Roszel Road, Suite A-204
Princeton, NJ 08540
     Attorneys for Defendants Boardwalk Regency Corp. d/b/a/
Caesar's Atlantic City, Wendy Rahier, Renee Giannini & Justin
Mens

John C. Simons, Esq.
HOAGLAND, LONGO, OROPOLLO & MORAN, LLP
40 Paterson Street
PO Box 480
New Brunswick, NJ 08903
     Attorney for Defendant Linda Ventura

**SIMANDLE**, Chief Judge:

I.  **INTRODUCTION**

Before the Court is a motion for summary judgment [Docket Item 32] brought by Defendants Boardwalk Regency Corp., doing business as Caesar's Atlantic City, and three Caesar's employees, Wendy Rahier, Renee Giannini and Justin Mens. Also pending are Defendant Linda Ventura's motion to preclude expert testimony and limit Plaintiffs' damages [Docket Item 38] and a cross-motion to preclude expert testimony and limit damages [Docket Item 43] brought by the rest of the Defendants.

Plaintiffs Cheryl Denisco and her mother-in-law Marie Denisco, along with their respective husbands John and James, brought this complaint alleging that Defendant Ventura, an aesthetician, used unsterilized needles while giving the women facials at the Qua Spa at Caesar's Atlantic City, possibly exposing the women to blood-borne diseases such as HIV and Hepatitis. [Compl. ¶¶ 22-24.] The complaint also named as Defendants Boardwalk Regency Corp. as well as spa manager Rahier, spa supervisor Mens and lead aesthetician Giannini (hereinafter "corporate Defendants" or "Caesar's"). Plaintiffs, who spent months fearing they might contract diseases and receiving medical tests and preventative treatment, seek damages for assault and battery, negligence, intentional and negligent infliction of emotional distress, and punitive damages.

The Court must decide if Plaintiffs and Defendant Ventura, in their opposition to the motion for summary judgment, adduce

2

evidence from which the finder of fact could reasonably find in favor of the Plaintiffs. The key factual questions concern the training and supervision of Defendant Ventura, namely whether the spa supervisors instructed Ventura not to use needles or other instruments that could penetrate the skin and whether the supervisors were aware that Ventura nonetheless regularly kept needles in her treatment room. Because the Court finds that Plaintiffs and Defendant Ventura raise genuine issues of material fact for most of their claims, the motion for summary judgment will be denied in large part and granted in part.

## II. Background

### A. Facts

Nearly all of the facts of this case are contested. On July 19, 2008, Cheryl and Marie Denisco received facials at the Qua Spa at Caesar's Atlantic City in Atlantic City, N.J. [Pl.'s Counter Statement of Facts ("Pl. SF") ¶ 1.] Corporate Defendants admit nothing else about that day's events.[1] [Def.'s Statement of Undisputed Facts ("Def. SF") ¶¶ 43-47; Def.'s Resp. to Pl.'s

---

[1] Defendant Ventura, who opposes the motion for summary judgment, does not describe the facts of the incident in her opposition and, as a non-moving party, was not in position to respond to Plaintiffs' counter statement of facts in a reply. However, in her later motion to bar expert testimony and limit Plaintiffs' damages, Defendant Ventura includes a "Statement of Undisputed Facts" that largely accepts Plaintiffs' account of July 19 and aftermath, including the facts that Defendant Ventura used a lancet on the women and the women later received medical tests and treatment. [Docket Item 38-2 at 1-7.]

Counter Statement of Facts ¶¶ 1-8.] Plaintiffs allege that
Defendant Ventura administered facials to both women,
successively, and that during the treatments she used a small
needle called a "lancet" to penetrate their skin. [Pl. SF ¶¶ 2-
4.] Both Plaintiffs allege the use of the lancet left marks on
their face, and Cheryl testified she started bleeding. [Id. ¶ 4;
Pl. Ex. O; Cheryl Dep. 35:15-22, 41:5-9.] Plaintiffs allege that
Defendant Ventura used "the same lancet on both Cheryl and Marie
and likely on other clients." [Pl. SF ¶ 5.] Plaintiffs allege
that the lancet was not sterilized between uses. [Id. ¶; Cheryl
Dep. 55:5-58:10.]

Plaintiffs feared the possibility that they had been
infected with blood-borne diseases, such as HIV or Hepatitis, and
sought medical treatment. [Pl. Opp'n at 3-4.] Each began a course
of prophylactic antiretroviral medication. [Id.] Over the course
of the next eleven months, Cheryl was tested for HIV and
Hepatitis several times, and each test came back negative.
[Cheryl Dep. at 85:24-87:13.] Marie was tested over a period of
90 days. [Marie Dep. at 29:14-19.] Both women testified they
adjusted their behavior as if they were infected with HIV and
engaged only in protected sexual activity with their husbands.
[Cheryl Dep. 82:4-9, 88:11-16; Marie Dep. 34:1-8.]

**B. Complaint and Procedural History**

Cheryl Denisco and her husband John, as well as Marie

Denisco and her husband James Denisco, filed a 16-count amended complaint against Defendant Ventura and the corporate Defendants. [Am. Compl. at Docket Item 10.] The complaint properly invoked diversity jurisdiction under 28 U.S.C. § 1332. [Id. ¶¶ 13-14.] Cheryl and Marie Denisco sued for assault and battery and negligence on various grounds, including using a lancet in violation of New Jersey law, N.J. Admin. Code § 13:28-2.15, using a lancet without exercising reasonable care, failure to sterilize the lancet and other equipment, and using a lancet without consent. [Id. ¶¶ 37-45, 61-70, 110-118, 134-144.] Plaintiffs also claim intentional infliction of emotional distress and negligent infliction of emotional distress against all Defendants. [Id. ¶¶ 89-106, 163-181.] Cheryl and Marie Denisco allege negligence against the corporate Defendants on additional grounds, including negligent entrustment, and negligent hiring, training and supervision of Defendant Ventura. [Id. ¶¶ 46-60, 119-133.] John and James Denisco allege loss of consortium. [Id. ¶¶ 185-190.] Plaintiffs also seek punitive damages. [Id. ¶¶ 107-109, 182-184.]

Defendant Ventura brought cross-claims against the corporate Defendants "for the proportionate share" of any judgment against her and for common law indemnification.[2] [Docket Item 24 at 18-

---

[2] All claims in the Amended Complaint were dismissed without prejudice against Defendants Giannini and Mens [Docket Item 29], but both are still parties to this action as cross-defendants, based on Defendant Ventura's cross-claims. [Docket Item 24.]

19.]

The corporate Defendants then filed the present motion for summary judgment. Soon thereafter, Defendant Ventura filed a motion to limit Plaintiffs' damages to emotional distress suffered in the "window of anxiety" between the date of the facials and when it became highly unlikely that Plaintiffs could develop HIV or Hepatitis from Ventura's use of the lancet, approximately one year from the date of the incident. [Docket Item 38 at 10-13.] Ventura also moves to bar expert testimony about Plaintiffs' emotional distress to the same window of anxiety." [Id.] Corporate Defendants filed a cross-motion to bar expert testimony and limit damages, relying on Defendant Ventura's statement of facts and legal brief.[3] [Docket Item 43.]

**III. Summary Judgment Motion**

**A. Standard of Review**

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if, based on the evidence in the record, a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

[3] As Defendant Ventura appears to accept more of the facts as stated by Plaintiffs than she did in her opposition to the motion for summary judgment, so, too, do the corporate Defendants, by expressly endorsing Defendant Ventura's statement of facts.

(1986). A fact is "material" if it might affect the outcome of the suit. Id. The court will view evidence in the light most favorable to the non-moving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541 (1999).

The Court will address the overlapping claims of Cheryl and Marie Denisco together.

**B. Negligent Hiring**

Under New Jersey law, negligent hiring has "two fundamental elements." Di Cosala v. Kay, 450 A.2d 508, 516 (N.J. 1982). First, an employer is liable "for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." Id. Second, "through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." Id.; see also Piscitelli v. Classic Residence by Hyatt, 973 A.2d 948, 965 n.9 (N.J. Super. Ct. App. Div. 2009) (restating the tort of negligent hiring as requiring "that the employer knew or had reason to know of the particular unfitness, incompetence, or dangerous attributes of the employee and that the employer could reasonably have foreseen that the qualities created a risk of harm to other

7

persons").

Corporate Defendants argue that there is no evidence in the record that Caesar's had or should have had knowledge of Defendant Ventura's unfitness, incompetence or dangerous attributes. [Def. Mot. at 5.] Rahier testified that Caesar's verified that all spa employees had appropriate licenses for massage therapy and for aesthetics, and that Rahier found Defendant Ventura to be a well-qualified, professional candidate for her job. [Rahier Dep. at 12:19-13:2, 47:20-25.]

Defendant Ventura, in her opposition to the motion, argues that her use of lancets was foreseeable, creating a genuine issue of material fact as to whether Rahier and Caesar's were negligent in hiring her. [Def. Ventura's Opp'n at 10-11.] Ventura supports this claim by arguing that she openly used lancets at Qua Spa and that her supervisors had seen them. [Id. at 11.] Even if that were true, any knowledge that Rahier or others developed after Ventura was hired would be irrelevant to whether Rahier and Caesar's were negligent in hiring Ventura in the first place. The only assertion that Ventura makes relevant to her hiring is that "[i]f Rahier had asked the right questions during her interview of Ventura, she would have learned that Ventura regularly used lancets and did not know lancets were illegal in New Jersey." [Id. at 11.] Ventura testified in her deposition that she had been trained at her previous job to use lancets and that her

8

previous employers bought lancets for her to use. [Ventura Dep. at 31:10-16, 73:6-11.]

Plaintiffs also argue that there are issues of material fact to show Caesar's was negligent in hiring Defendant Ventura, however, Plaintiffs argue in support of their claims for negligent hiring, supervision and training simultaneously, and exclusively discuss Ventura's training or supervision. [Pl. Opp'n at 7-11.] In their response to the corporate Defendants' statement of facts, Plaintiffs argue that Caesar's never provided Rahier with any training about the laws of New Jersey, at most implying that Rahier should have known about the prohibition of lancets during the hiring process. [Pl. SF ¶ 10; Rahier Dep. at 13:7-11.]

The evidence in the record does not create a genuine issue of material fact as to Caesar's negligent hiring. An employer is not required to ask all conceivable questions about a prospective employee's practices or techniques, especially where, as here, the applicant was duly licensed and there is no indication, even today, that her prior use of lancets was unlawful or without consent of her clients. Because all new employees participate in training controlled and run by Qua Spa, if Ventura emerged from the training with the understanding that the use of lancets was permitted and acceptable, the negligence would lie in the deficient training and supervision of Ventura, not in the

decision to hire Ventura as the person to perform work according to the employer's guidelines and policies. Similarly, even if Rahier were ignorant of relevant New Jersey laws and regulations, that ignorance would not be relevant at the time of hiring; rather, that lack of knowledge might help support a claim of negligent training or supervision, if the supervisors lacking relevant knowledge insufficiently trained or supervised their employees as a result. The record contains no evidence that Ventura ever used lancets inappropriately or on patients without their consent prior to employment at Qua Spa. Therefore, Defendant Ventura's alleged dangerous attributes or characteristics did not create a foreseeable risk of harm to others, and corporate Defendants were not negligent in failing to uncover Ventura's past experience with lancets during the hiring process. The motion for summary judgment on the claim of negligent hiring will be granted.

### C. Negligent Training

To sustain a claim of negligent training under New Jersey law, the plaintiff must show: "(1) the defendant owed a duty of care to the plaintiff, (2) defendant breached that duty of care, (3) defendant's breach was the proximate cause of plaintiff's injury, and (4) defendant's breach caused actual damages to plaintiff." Stroby v. Egg Harbor Twp., 754 F. Supp. 2d 716, 721 (D.N.J. 2010) (citing Weinberg v. Dinger, 524 A.2d 366, 374-75

(1987)).

Corporate Defendants argue that Plaintiffs fail to adduce evidence on the second and third elements of the claim, breach of duty and proximate cause. [Def. Mot. at 8.] Defendants argue that Ventura was provided with a job description that stated employees are "not to use any equipment that can break the skin." [Id.; Def. Ex. H.] Defendants also argue that new hires are trained on the "step-by-step procedures as to how to give a facial." [Def. Mot. at 8.] New aestheticians are not permitted to bring in their own tools or instruments to the spa and are not permitted to bring personal items into treatment rooms. [Id. at 8-9.]

Plaintiffs counter with evidence contradicting each of these contentions. Plaintiffs claim that Defendant Ventura never received the cited job description that warned employees about equipment that breaks the skin. Plaintiffs point to the receipt of property issued to and signed by Ventura, in which she acknowledged receiving 11 documents from Caesar's; the list does not include the job description. [Pl. Ex. H.] Plaintiffs argue that Ventura never received step-by-step training about how to give a facial. [Giannini Dep. at 45:15-46:1 (stating that the brochure given to Ventura did "not say[] how to specifically do any facial").] Ventura testified that she was never told during the training not to use lancets or what tools to use. [Ventura Dep. 35:6-14.] Giannini and Ventura both testified that they

11

never were told they were prohibited from bringing in outside implements to the spa. [Id. at 25:13-16 (answering in the negative whether "anybody ever [told] you you were not permitted to bring in any outside implements or materials?"); Giannini Dep. at 28:11-15 (answering in the negative a question whether there was "any discussion during that training at all about whether or not you're permitted to bring anything into the spa").] Ventura also testified that had she known the use of lancets was prohibited, "I would never have used it, never." [Ventura Dep. at 31:16-18.]

This evidence, and inferences favorable to the non-moving Plaintiffs, could permit a reasonable jury to find that training was negligent, and thus Plaintiffs have raised a genuine issue of material fact as to the content of Ventura's training. If Plaintiffs' evidence is to be believed, Ventura was never taught how to perform facials, never told what tools she was permitted to use and never told she could not bring in her own tools. She also stated that had she known she was not permitted to use lancets, she would not have used them, permitting a jury to conclude that deficient training was a proximate cause of Plaintiffs' injuries. These issues of fact are for a jury to decide, and thus the Court will deny summary judgment on the issue of negligent training.

### D. Negligent Supervision

The tort of negligent supervision also requires proof of duty, breach of duty, causation and injury. See Dixon v. CEC Entm't, Inc., No. L-4087-04, 2008 WL 2986422, at *18 (N.J. Super. Ct. App. Div. Aug. 6, 2008); Hoag v. Brown, 935 A.2d 1218, 1230 (N.J. Super. Ct. App. Div. 2007). An employer will be liable for harm resulting from its employee's conduct if the employer is negligent or reckless "in the supervision of the activity." Dixon, 2008 WL 2986422, at *18 (quoting Restatement (Second) of Agency § 213(c)).

Corporate Defendants argue that the record is devoid of evidence that the Defendant should have "reasonably foreseen that Ventura would use a lancet and injure a customer during the performance of her duty." [Def. Mot. at 7.] Defendants argue that Ventura was licensed and was observed during training to be professional. [Id.] Defendants argue that Ventura never told anyone she bought and used lancets, and no one from Caesar's had notice that Ventura was using lancets or engaging in behavior that could have harmed guests. [Id.]

In opposition, Plaintiffs point to evidence previously discussed about the lack of training or notice to Ventura that the use of lancets was prohibited. [Pl. Opp'n at 7-11.] Plaintiffs claim that Ventura regularly used her own tools on clients, including extractors, scissors and lancets. [Id. at 9; Ventura Dep. at 22:10-23:5.] Ventura testified that she used

13

lancets on approximately 10 percent of her clients. [Ventura Dep.
at 66:23-67:6.] Ventura testified that she "always" left lancets
in her ultraviolet light sterilizer and would occasionally leave
10 to 15 lancets in a dish overnight. [Id. at 78:11-16, 85:1-
86:14, 88:22-89:2.] Ventura testified that after her training,
Giannini had inspected her treatment room and removed all
equipment except for a high frequency machine the aestheticians
were permitted to use. [Id. at 77:4-7.] Ventura testified that
she occasionally stored lancets in her treatment room, which
Giannini would have seen. [Id. at 78:2-16 (stating that Giannini
"went through all of my drawers, all my cabinets and took things
out of my room, and only put in what she wanted me to use,
therefore, she must have seen the lancets").] Ventura stated that
Giannini cleaned her room on an ongoing basis, and that a spa
assistant was responsible for changing the fluid in her
sterilization tray. [Id. at 80:19-81:12.] Plaintiffs also rely on
Defendant Ventura's testimony that another aesthetician, Agnes
Kit, told Ventura that she had heard Giannini tell another
employee that there were lancets in Ventura's room.[4] [Pl. Opp'n

---

[4] The Court notes that this evidence, as it stands, likely
would not be admissible as evidence at trial. Plaintiffs attach
no deposition or affidavit from Kit. What Kit told Ventura she
heard Giannini say to another employee ordinarily would be
hearsay under Fed. R. Evid. 801(c). Although Giannini is an
opposing party, and statements made by party opponents are not
hearsay under Rule 801(d)(2), the Court at this time is unable to
find an exception to the hearsay rule for Ventura's recounting of
what Kit told her.

at 10.]

Taken together, this evidence raises a genuine issue of material fact as to whether Defendant Ventura's supervisors knew or should have known about her use of lancets and whether they were at least negligent for permitting Ventura to continue to use the tools in the spa. If the testimony about what Kit heard is to be believed, then Giannini knew Ventura had lancets in her treatment room. Even apart from that evidence, a reasonable jury, viewing the record evidence in the light most favorable to Plaintiffs, could find that Ventura's supervisors had opportunities to discover Ventura's use of lancets and were negligent in either not discovering Ventura's lancet use or failing to stop the use of lancets upon discovery. Because the claim depends upon factual issues of supervisors' knowledge and opportunity for discovery lancet use, summary judgment on the

---

However, the Supreme Court has stated that evidence used in opposition to a motion for summary judgment need not be in a form admissible at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses.") The Third Circuit has held that "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'" Williams v. Borough of West Chester, Pa., 891 F.2d 458, 465 (3d Cir. 1989). Because Defendants have not raised a hearsay objection to the statements concerning Kit, and because the Court is aware of no reason why Kit could not testify about what she heard Giannini say, the Court will consider this evidence.

issue of negligent supervision will be denied.

### E. Assault and Battery

Battery is defined in New Jersey law as harmful or offensive touching of plaintiff's person without consent. Caldwell v. KFC Corp., 958 F. Supp. 962, 970 (D.N.J. 1997) (citing Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958, 965 (N.J. 1994)). Here, Cheryl and Marie testified that the harmful use of lancets to penetrate their skin was without their consent. [Cheryl Dep. at 34:9-13; Marie Dep. at 15:9-17.]

An employer is liable for torts committed by an employee if (1) a master-servant relationship exists and (2) the tortious conduct occurred within the scope of employment. Carter v. Reynolds, 815 A.2d 460, 463-64 (N.J. 2003). Conduct is considered within the scope of employment if the conduct (1) "is of the kind he is employed to perform," (2) "occurs substantially within the authorized time and space limits," and (3) "is actuated, at least in part, by a purpose to serve the master." Id. (quoting Restatement (Second) of Agency § 228). Conduct is not within the scope of employment if it is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Id. at 465.

Corporate Defendants argue that Defendant Ventura's conduct was not authorized and was not within the scope of employment.

[Def. Mot. at 10-11.] Defendants assert that Ventura was not provided with, instructed to, or permitted to, use lancets. Id. at 10.] She was given step-by-step training about how to give a facial, and she was told she could not bring in her own tools. [Id. at 11.] Defendants conclude that because Ventura "violated Caesar's policy by bringing in her own lancets to the Qua Spa, any of her intentional acts against the plaintiffs are not within the scope of her employment." [Id. at 11.]

As previously discussed, Plaintiffs have adduced sufficient evidence to raise a genuine issue of material fact as to whether she was (1) instructed about the use of lancets, (2) permitted by her supervisors to use to tools that were left in the open in her treatment room, (3) given step-by-step training on how to perform facials, and (4) told she could use lancets.

New Jersey law is clear that an employee's conduct may be considered within the scope of employment even if that conduct is tortious or illegal. Davis v. Devereux Found., 37 A.3d 469, 490 (N.J. 2012) (stating an "act may be within the scope of employment although consciously criminal or tortious"); Siemens Fin. Servs., Inc. v. Haband Co., Inc., No. A-2738-08T2, 2010 WL 2089802, at *5 (N.J. Super. Ct. App. Div. May 25, 2010) ("an employee may be acting within the scope of employment if a tortious or criminal act is done on the employer's behalf"); Roth v. First Nat. State Bank of New Jersey, 404 A.2d 1182, 1185 (N.J.

17

Super. Ct. App. Div. 1979) ("an act may be within the scope of employment although consciously criminal or tortious," citing Restatement (Second) of Agency § 231). Therefore, even if Ventura's use of lancets was not permitted under the official Qua Spa policy, the inquiry does not end there.

Whether conduct is within the scope of employment ordinarily is a question of fact to be decided by the jury, once the plaintiff has introduced sufficient evidence to raise a question of fact. Gray v. Great Am. Recreation Ass'n, Inc., 907 F.2d 1081, 1083 (2d Cir. 1992) (applying New Jersey law, citing Cleaves v. Yeskel, 133 A. 393, 395 (N.J. 1926)); see also 18 N.J. Prac., Employment Law § 12.33 (2d ed.) (stating that where "the 'scope of employment' issues raises a factual dispute, such a dispute is for a jury to decide," citing Cosgrove v. Lawrence, 520 A.2d 844, 848 (N.J. Super. Ct. Law Div. 1986)).

The Court finds Plaintiffs have raised a genuine issue of fact as to whether Defendant Ventura was acting within the scope of her employment. There is no dispute that Ventura was an employee of the spa and that the alleged incident occurred within normal business hours at the spa facility. The remaining question is whether Plaintiff was motivated, at least in part, by a desire to serve her employer or if the use of lancets rendered the facial treatments so different in kind than those authorized by the employer that she was acting outside the scope of her

employment. Ventura used lancets as part of her regular facial treatment for certain customers [Ventura Dep. at 66:23-67:6], and performance of those facials undoubtedly was actuated with the purpose of serving the employer; she was employed to give facials. As previously discussed, Ventura testified she was under the impression that her supervisors were aware of her use of lancets and tacitly endorsed the use of the needles. [Id. at 27:8-28:24, 78:19-23 (testifying that Kit heard Giannini acknowledge the lancets to another employee, and testifying that "I thought, okay, at least [Giannini] is letting me use them [lancets] because she would have taken them, if she had not wanted me to use them, like she took everything else out of there.").] This is not a case where, as a matter of law, the Court can conclude that facials that incorporate the use of lancets are "different in kind" from facials without the use of lancets, or that Ventura was "too little actuated by a purpose to serve" her employer. Carter, 815 A.2d at 465. Therefore, summary judgment on the claim of vicarious liability for battery must be denied.

### F. Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress, a plaintiff must prove that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," (3) the defendant's actions were the proximate cause of the plaintiff's emotional distress, and (4) the emotional distress was "so severe that no reasonable man could be expected to endure it." Buckley v. Trenton Savings Fund Soc., 544 A.2d 857, 863 (N.J. 1988). Conduct is intentional if the defendant desires both to do the act and to produce emotional distress or if the harm is substantially certain to result from the conduct. Id.; see also Restatement (Second) of Torts § 8A (defining "intent . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it"). Conduct is reckless if the defendant acts "in deliberate disregard of a high degree of probability that emotional distress will follow." Buckley, 544 A.3d at 863; see also Ingraham v. Ortho-McNeil Pharmaeutical, 25 A.3d 1191, 1195 (N.J. Super. Ct. App. Div. 2011) (reciting the Buckley standard).

Corporate Defendants argue that there is no evidence that Caesar's acted intentionally or recklessly, because Caesar's adequately trained its staff and did not provide Defendant Ventura with lancets. [Def. Mot. at 13.] Moreover, the Defendants argue that Ventura acted outside the scope of her employment and, in any event, Caesar's conduct cannot be deemed "so outrageous in character and extreme in degree as to go beyond all bounds of

decency." [Id.]

   As previously discussed, Plaintiffs have already raised a
genuine issue of material fact as to whether Ventura was trained
not to use lancets and whether she was acting within the scope of
her employment. Also, the record includes evidence that would
permit a reasonable factfinder to conclude that Ventura's
supervisors were aware of her use of lancets. [Ventura Dep. at
27:8-28:24, 76:19-22, 78:19-23 (testifying that Giannini
regularly cleaned or inspected her treatment room and removed
items that were not permitted, giving Ventura the impression that
the use of lancets was sanctioned, and that Giannini told another
employee that there were lancets in Ventura's treatment room).] A
reasonable factfinder therefore could find that Caesar's was
aware of the use of illegal needles in its spa and acted at least
recklessly when it did not seek to prevent their use.

   To be liable, however, the Defendants must have intended
emotional harm or acted with deliberate disregard of a high
probability that emotional harm would result. There is no
evidence in the record that Caesar's employees intended
Plaintiffs to suffer severe emotional distress, and there is no
evidence to support a finding that emotional distress was
substantially certain to result from Defendants' conduct.
Therefore, Plaintiffs may sustain a claim for intentional
infliction of emotional distress only if they raise a genuine

21

fact issue as to whether Defendants acted in "deliberate disregard of a high degree of probability that emotional distress will follow." Ingraham, 25 A.3d at 1198.

The New Jersey Superior Court, Appellate Division, considered whether a defendant's mental state concerning emotional distress may be inferred in Colello v. Bayshore Community Health Servs., No. L-3476-05, 2010 WL 1753164 (N.J. Super. Ct. App. Div. Apr. 28, 2010). There, the plaintiff alleged that her supervisor, Solis, sexually harassed her by forcibly kissing her and making inappropriate remarks, and sued the hospital on a vicarious liability theory for intentional infliction of emotional distress by Solis. The trial court granted summary judgment because (1) the court did not find a proper agency relationship between the hospital and the supervisor, (2) there "appear[ed] to be no intent or requisite disregard here of the feelings of the plaintiff," and (3) the conduct was not so outrageous that it exceeded all bounds of decency. Id. at *14-*15. The appellate court reversed, arguing that there was a question of fact about the agency relationship. Id. at *15. The court also stated that

> [t]here is little in the motion record from which
> Solis's mental state can be discerned . . . ; a
> reasonable juror could infer that Solis acted
> intentionally and without regard to plaintiff's
> reaction. At the very least, the uncertainty in the
> motion record regarding Solis's motivations militated
> against the summary dismissal of plaintiff's claim.

22

Id. The court added that a reasonable juror could find that
Solis's conduct was especially egregious because of the power
dynamics within the hospital. Id.

As stated above, there is some evidence that Caesar's had
actual knowledge of the presence of prohibited lancets in a
treatment room, which, according to the Defendants would have
violated their own policy, and did not take steps to remove them
or, at the very least, to protect against their misuse. A
reasonable jury could conclude this behavior was reckless. The
only remaining question is whether, from that same conduct,
Defendants' mental state may be inferred and whether a reasonable
jury could conclude that Defendants deliberately disregarded the
probability that emotional harm would result from their acts or
omissions.

A determination of a defendant's state of mind can be made
only from the "totality of circumstances" surrounding defendant's
conduct, and "a question of intent, or proximate cause, is
ordinarily left to the jury's determination with proper
instructions." Wilson v. Parisi, 633 A.2d 113, 115 (N.J. Super.
Ct. App. Div. 1993) (citing Ruvolo v. Am. Cas. Co., 189 A.2d 204,
210 (N.J. 1963) and Judson v. Peoples Bank & Trust Co. of
Westfield, 110 A.2d 24, 28 (N.J. 1954), among other cases). See
also Morton Intern., Inc. v. Gen. Acc. Ins. Co. of Am., 629 A.2d
895, 907 (N.J. Super. Ct. App. Div. 1991) (stating that "summary

23

judgment should be denied unless the right thereto appears so clearly as to leave no room for controversy," particularly when the underlying facts are in dispute).

Here, as in Colello, there is little in the motion record from which Defendants' mental state can be discerned, and the uncertainty in the motion record regarding Defendants' motivation for their acts or omissions militates against a summary dismissal of the claim. Colello, 2010 WL 1753164, at *15. In light of New Jersey precedent that suggests determination of mental state ordinarily should be reserved for the jury when the underlying facts are in dispute, the Court is hesitant to rule that a reasonable jury could not infer the requisite mental state from Defendants' arguably reckless behavior described in the record.

The record also contains evidence to enable a factfinder to conclude that the remaining elements of the tort are present. A jury could find that tolerating the presence and apparent use of illegal and potentially harmful lancets in a spa - where the Defendants owed a duty to their customers receiving therapeutic, if not quasi-medical, treatments - was an outrageous and extreme abdication of responsibility. The record evidence also supports a finding that failure to remove the lancets or properly inform and train the aestheticians was a proximate cause of the Plaintiffs' emotional distress, which directly and immediately arose from fear of improper use of the lancets. [Cheryl Dep. at 51:13-17.]

Finally, the Plaintiffs testified at length as to the severity of their emotional distress, including fear of being infected with serious diseases such as HIV and Hepatitis, repeated medical visits, changes in lifestyle as a result of possible infection, and among other manifestations. [Cheryl Dep. 76:19-23, 77:23-78:3, 81:5-10, 83:11-18, 84:19-87:13, 98:4-14; Marie Dep. 26:1-3, 26:24-28:9, 29:14-19, 32:20-24.] Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable factfinder could conclude that Caesar's is liable for intentional infliction of emotional distress, and summary judgment will be denied.

### G. Negligent Infliction of Emotional Distress

Based on the foregoing analysis of intentional infliction of emotional distress, a reasonable factfinder could find that the Defendants were at least negligent in not preventing the use of lancets in their spa and that their negligence proximately caused plaintiff's injuries. To establish liability for negligent infliction of emotional distress, "a plaintiff must prove that defendant's conduct was negligent and proximately caused plaintiff's injuries. . . . [L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury to a person normally constituted." Decker v. Princeton Packet, Inc., 561 A.2d 1122, 1128 (N.J. 1989) (internal quotation marks omitted). See also Lascurain v. City of Newark, 793 A.2d 731, 746-47 (N.J. Super. Ct. App. Div. 2002) ("A claim

of direct, negligent infliction of emotional distress requires a plaintiff to show that the defendant had a duty, the defendant owed the duty toward the plaintiff, and that the defendant breached that duty proximately causing the plaintiff's injury of genuine and substantial emotional distress.").

A jury could find that infections were a foreseeable result from misuse of needles, particularly at the hands of non-medical professionals. The record supports a finding that Caesar's owed a duty to Plaintiffs and failure to remove the lancets or properly inform and train the aestheticians was both a breach of that duty and a proximate cause of the Plaintiffs' emotional distress. Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable factfinder could conclude that Caesar's is liable for negligent infliction of emotional distress, and summary judgment will be denied.

### H. Negligence Per Se

The parties agree that the provisions of the New Jersey Administrative Code that deal with the Board of Cosmetology and Hairstyling have listed as a "prohibited practice" the "[u]se or offer to use a credo blade, skin scraper, lancet, or other comparable implement." N.J. Admin. Code § 13:28-2.15(b)(1). The provision also provides that the holder of the "shop license at which such unlawful practices occur shall be deemed to have engaged in unlawful practice pursuant to N.J.S.A. 45:5B-13(e) and

may be subject to penalty if he or she aids, abets, or permits a practitioner to engage in any conduct prohibited by this section." § 13:28-2.15(a).

In New Jersey, a "violation of a statutory duty of care is not conclusive on the issue of negligence in a civil action but it is a circumstance which the trier of fact should consider in assessing liability." Braitman v. Overlook Terrace Corp., 346 A.2d 76, 85 (N.J. 1975). However, to be evidential, the statutory violation "must be causally related to the happening of the accident, since a permissible inference of causality is indispensable to its relevancy." Badalamenti v. Simpkiss, 27 A.3d 191, 201 (N.J. Super. Ct. App. Div. 2011). For the issue of the defendant's liability to be presented to a jury, "there must be evidence or reasonable inference therefrom showing a proximate causal relationship between defendant's negligence, if found by the jury, and the resulting injury." Id. (quoting Sanchez v. Indep. Bus Co., Inc., 817 A.2d 318, 324 (N.J. Super. Ct. App. Div. 2003)).

Defendants argue that Plaintiffs cannot show that Caesar's violated any statute or regulations because Caesar's did not purchase or provide lancets to the spa staff. [Def. Mot. at 9.] Rather, Defendants argue, the staff was prohibited to use lancets by the spa's policy. [Id. at 9-10.] Defendants reiterate that Defendant Ventura was acting outside the scope of employment when

bringing lancets into the spa. [Id. at 10.]

Plaintiffs respond that the evidence in the record could permit a factfinder to find that Caesar's aided, abetted and/or permitted Ventura to use lancets. Based on the evidence previously discussed, the Court concludes that there is sufficient evidence (giving Plaintiffs the reasonable inferences flowing from the evidence most favorable to them) to permit a finding that Caesar's aided, abetted or permitted the use of lancets in the spa, such that Caesar's would be in violation of N.J. Admin. Code § 13:28-2.15. Summary judgment will be denied on the issue of negligence per se.

## I. Res Ipsa Loquitur

In New Jersey, res ipsa loquitur "is a principle which permits, but does not compel, a jury to infer negligence from the mere happening of a particular event." Tierney by Tierney v. St. Michael's Med. Cntr., 518 A.2d 242, 244 (N.J. Super. Ct. App. Div. 1986). The rule applies to cases in which "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." Szalontai v. Yazbo's Sports Café, 874 A.2d 507, 515 (N.J. 2005).

Defendants argue that res ipsa loquitur is not properly

applied in this case, but rather applies in limited tort cases that involve facts such as "the collapse of a stairway . . . , or where a soda bottle explodes without warning . . . , or where an automatic door at a supermarket suddenly swings backwards . . . , or when a sponge is left in the body of a patient following surgical procedure." [Def. Mot. at 11-12.] See also Khan v. Singh, 975 A.2d 389, 395 (N.J. 2009) (describing these cases). Defendants deny that this case "bespeaks negligence" or that the instrumentality of harm was in the exclusive control of corporate Defendants. [Id. at 12.]

Plaintiffs respond that the facts of the case satisfy the three elements of the test: "repeated use of a needle, such as a lancet, on a number of persons without the proper sterilization ordinarily bespeaks negligence"; the lancet was in the exclusive control of Ventura, a Caesar's employee; and neither Cheryl nor Marie contributed to the injury. [Pl. Opp'n at 17.]

This case about the use of a unsterilized needle can be analogized to medical malpractice cases in New Jersey. In Buckelew v. Grossbard, 435 A.2d 1150 (N.J. 1981), the New Jersey Supreme Court extended the use of the res ipsa loquitur doctrine to the medical malpractice area, despite the fact that medical negligence claims often relied on expert testimony to establish the standard of care, rather than on common knowledge, as is typical in the ordinary res ipsa loquitur case. See Kahn, 975

A.2d at 395 (summarizing Buckelew and the development of the res ipsa loquitur doctrine). In Buckelew, that court held that "expert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of res ipsa loquitur." Buckelew, 435 A.2d at 1158.

In New Jersey, as in other jurisdictions, experts are not required to establish the standard of care when, "under the common knowledge doctrine, the issue of negligence is not technical and the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." Rojas v. Rubenstein, No. L-4872-08, 2012 WL 4935498, at *6 (N.J. Super. Ct. App. Div. Oct. 18, 2012); see also Davis v. United States, No. 08-0461, 2009 WL 1455976, at *31 (D. Haw. May 26, 2009) (including the failure to sterilize instruments in a list of exceptions, under the "common knowledge" exception). This is such a case.

The Court agrees with Plaintiffs that a jury should be permitted to find that the use of unsterilized needles on multiple patients or customers does not ordinarily occur without negligence, upon proof that the instrumentality was in defendant's sole control and there is no indication of contributory negligence. See State v. Wenzel, 273 A.2d 395, 396

(N.J. Super. Ct. App. Div. 1971). From such evidence may arise a permissible, but not mandatory, presumption of negligence, and the Defendants are then required to present an explanation to refute the presumption that the incident did not occur by a lack of care. Id.

Summary judgment on the issue of res ipsa loquitur will be denied.

### J. Loss of Consortium

Plaintiffs John and James Denisco both bring claims for loss of consortium, which is a derivative claim intended to compensate a person for the loss of a spouse's society, companionship and services due to the fault of another. See Kibble v. Weeks Dredging & Const. Co., 735 A.2d 1142, 1149 (N.J. 1999) (describing loss of consortium). Defendants argue that summary judgment should be granted because all of Plaintiffs' primary claims are without merit. However, having found that Plaintiffs raise issues of fact to be decided by a jury on most of their claims, entry of summary judgment on the loss of consortium claim is inappropriate and will be denied as to the remaining claims in this suit.

### K. Punitive Damages

Plaintiffs seek punitive damages under the Punitive Damages Act, N.J. Stat. Ann. § 2A:15-15.9, et seq. The statute provides that punitive damages will be awarded only if the plaintiff

proves, by clear and convincing evidence, that the defendant's acts or omissions caused the harm and were "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed . . . ." § 2A:15-5.12. Proving mere negligence or gross negligence is not sufficient to be eligible for punitive damages. Id. The question of whether allegations prove wanton or reckless conduct is a jury question. Manee v. Edgewood Props., Inc., No. L-10990-01, 2007 WL 268248, at *9 (N.J. Super. Ct. App. Div. Feb. 1, 2007) (citing Spragg v. Shore Care, 679 A.2d 685, 698 (N.J. Super. Ct. App. Div. 1996)).

Defendants argue that there is no evidence that Caesar's acts or omissions were actuated by actual malice or wanton and willful disregard of persons. However, as already established, Plaintiffs have raised a question of whether Caesar's supervisors were aware of Ventura's use of lancets and did not act to prohibit their use. These facts present for the jury a question of whether Caesar's was wanton or reckless in its acts or omissions. Summary judgment on punitive damages will be denied.

In sum, Defendants' motion for summary judgment will be granted on the issue of negligent hiring, but denied as to all other claims brought by Plaintiffs, who have, along with Defendant Ventura, raised genuine issues of material fact that must be presented to a factfinder.

**IV. Motion to Limit Damages and Expert Testimony**

32

Defendant Ventura brings a separate motion to limit damages and bar expert testimony.[5] [Docket Item 38.] Specifically, Ventura argues that, under Williamson v. Waldman, 696 A.2d 14, 23 (N.J. 1997), plaintiffs' damages for emotional distress are limited to the "window of anxiety," i.e., "the period after which such a reasonable and well-informed person no longer would experience continuing emotional distress."

In Williamson, plaintiff Williamson was pricked by a lancet and feared contracting hepatitis or HIV. Williamson, 696 A.2d at 16. Her doctor initially told her that she would have to be tested for seven to ten years, but later adjusted that window to a year or two. Id. Williamson received multiple, negative test results and was told that her chances of having contracted HIV were "slim or remote." Id. She then brought a law suit seeking damages for, among other things, negligent infliction of emotional distress, loss of earning capacity, and future medical costs. Id. at 17.

The Williamson court concluded that emotional distress damages must be based on fears experienced by a reasonable, well-informed person and should be limited to the "window of anxiety."

---

[5] Corporate Defendants file a two-paragraph cross-motion to limit damages and bar expert testimony, stating that they "will rely upon co-defendant Linda Ventura's statement of undisputed material facts and legal brief in support of her motion to Limit Plaintiff's Damages and Bar Expert Testimony." [Docket Item 43 at 2.]

Id. at 23. The court, seeking to combat ignorance about HIV and
AIDS, held that continued emotional distress after the window of
anxiety closed would be considered "idiosyncratic." Id.
Acknowledging the reality of evolving medical knowledge, the
court held that the window of anxiety appeared to range from six
months to one year. Id.

Defendant Ventura argues that Cheryl's "window of anxiety"
is one year, because after one year, it was highly unlikely that
the spa lancet incident would result in an infection of any
disease. [Def. Ventura's Mot. at 11; see also Cheryl Dep. at
83:19-24, 86:19-87:19 (testifying that Cheryl's doctor told her
that she was at risk for infection for one year, but after that
it was "highly unlikely" that she would develop diseases from the
incident).] Ventura argues that Cheryl own's conduct supports a
one-year window, because approximately 11 months after the
incident, Cheryl and her husband once again began trying to
conceive a child - something she had postponed while she feared
she was at risk of infection. [Id.; Cheryl Dep. at 88:15-89:5.]
Ventura asserts that, even if Cheryl continues to suffer from
emotional distress, such suffering is "idiosyncratic" and that no
reasonable person, well informed about the risks of developing
HIV or Hepatitis, would continue to suffer emotional distress
from the lancet incident. [Id. at 12.] Ventura requests that
damages be limited to injuries suffered during her one-year

34

window and that expert testimony about Cheryl's emotional distress or other symptoms suffered outside of her window of anxiety be barred. [Id.]

Ventura argues that Marie's window of anxiety must be limited to 90 days. [Id. at 13.] Marie was monitored for HIV and Hepatitis for 90 days and after that period no longer sought medical treatment or adjusted her conduct because of the risk of infection. [Id.]

Plaintiffs respond that Williamson sets no strict limit on damages for emotional distress and, at any rate, Williamson is distinguishable from the case at bar. [Pl. Opp'n; Docket Item 42-2 at 4.] Plaintiffs argue that the damages bar does not apply to cases resulting from assault and battery, and that Plaintiffs' injuries result from "battery by Defendant Ventura." [Id. at 5.] Plaintiffs also attempt to distinguish Williamson on its facts, arguing that (1) Williamson did not fear contracting Hepatitis or other diseases in addition to HIV, and therefore did not suffer emotional distress due to fear of contracting Hepatitis, (2) Williamson did not delay a planned attempt to conceive a child, and (3) Williamson did not fear "potential long term and unknown side effects of the prophylactic HIV medication protocol following potential HIV exposure as she did not undergo a course of antiretrovirals" as Plaintiffs did. [Id. at 6.]

Defendants, in reply, reiterate the medical evidence that

Williamson relied upon and argue that the fear of contracting
Hepatitis should be governed by the same rules. [Def. Ventura's
R. at 5-6.] Defendants attach exhibits from the Centers for
Disease Control and Prevention that indicate that anti-Hepatitis
C virus (HCV) can be detected in greater than 97 percent of
persons within six months of exposure, and Hepatitis B has an
incubation period of six weeks to six months. [Docket Item 44-1;
Def. Exs. A & C.] The documents also suggest that after receiving
a negative result from an anti-HCV screening test, no further
testing or evaluation is needed. [Docket Item 44-1; Def. Ex. E.]
Defendant concludes that a six-month window for Hepatitis
infection is reasonable, and a reasonable person certainly would
no longer fear infection of Hepatitis after one year and
receiving negative test results. [Docket Item 44 at 7-8.]

     The Court is unpersuaded by Plaintiffs' attempts to
distinguish Williamson. The Court finds no reason to distinguish
among types of blood-borne diseases, when applying the Williamson
rule that emotional distress damages must be restricted to those
suffered by reasonable, well-informed people. In addition,
factual differences between this case and those of Williamson,
such as specific symptoms suffered by the plaintiffs and changes
to plans to start a family, might affect the amount of damages
that Plaintiffs receive, but they do not serve to bar the
application of the Williamson rule in its entirety. The Court

agrees that both diseases feared by Plaintiffs would have manifested themselves within the one-year period; Plaintiffs present no evidence that a longer window is required. Therefore, the Court holds that expert testimony on the issue of emotional distress stemming from fear of infection of blood-borne diseases be limited for both Plaintiffs to the window of anxiety of one year. In addition, damages stemming from emotional distress will also be limited to those incurred during the same one-year period.[6]

The Court disagrees that Marie's window of anxiety should differ from Cheryl's. If Plaintiffs experienced the same possible exposure to diseases, their chances of infection, as a matter of science, would appear to be the same. The fact that the record shows Marie apparently suffered less emotional distress than Cheryl, and for a shorter period of time, is relevant to the

---

[6] To be clear, the Court does not hold that Plaintiffs are entitled to recover only for emotional distress damages. After trial, a jury may decide that Plaintiffs deserve to be compensated for physical injuries and/or medical expenses as a result of Defendants' conduct, for example, as well as punitive damages. The Williamson bar serves to limit recovery for emotional distress suffered after the one-year window has closed. Accordingly, expert testimony on the issue of emotional distress will be limited to that suffered by Plaintiffs within the window of anxiety. Ultimately, if it reaches the damages issue, the jury will decide on the length and quantum of emotional distress damages arising from reasonable fear of infectious disease in this case, provided that the asserted length may not be greater than one year. In other words, the Defendants remain free to attempt to persuade the jury that such emotional distress associated with fear of infectious disease did not exceed a few months, given the negative test results.

amount of damages, if any, Marie deserves; it does not mean that the medical risk of her contracting the same diseases from the same lancet allegedly used on Cheryl is, as a matter of law and science, one-quarter that of Cheryl's.

Finally, the Court declines Plaintiffs' request to permit damages related to unspecified, unknown effects of taking one month of antiretroviral medication, which, to this point, have not manifested themselves. To be sure, extreme long-term effects of antiretroviral drugs might not be known, but the same may be said of virtually any medication, and not every patient who takes a course of medication may sue for emotional distress related to purely speculative effects, especially when the drugs have caused nothing more than expected, short-term side effects. In addition, the course of antiretroviral medication that the Plaintiffs took lasted only one month, and that period of medication is now many months in the past. [Cheryl Dep. at 84:19-21 (testifying she took antiretroviral medication for one month); Marie Dep. at 28:5-9 (same).] Although medical knowledge is always evolving, antiretroviral medication could not be considered an experimental treatment as of 2008. See generally Determining Disability & Blindness, 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 114.00(G)(5)(a) (describing the known side effects of antiretroviral drugs, within the Code of Federal Regulations, under Employees' Benefits and administration of the Social Security Administration).

38

The New Jersey Supreme Court, in <u>Mauro v. Raymark Indus.,</u> <u>Inc.,</u> 561 A.2d 257, 263 (1989), declined to reach the question whether exposure to toxic chemicals without physical injury would sustain a claim for emotional-distress damages based on a reasonable fear of future disease. But the court reiterated the "long-standing rule in New Jersey . . . that prospective damages are not recoverable unless they are reasonably probable to occur."[7] <u>Mauro</u>, 561 A.2d at 261. The New Jersey Appellate Division later ruled that "if there is no physical injury and the emotional distress is only that generally arising from the knowledge that a person has been tortiously exposed to a toxic substance, there can be no recovery." <u>Theer v. Philip Carey Co.</u>, 611 A.2d 148, 153 (N.J. Super. Ct. App. Div. 1992), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 628 A.2d 724 (N.J. 1993). Here, Plaintiffs have made no attempt to demonstrate that they have suffered a physical injury as a result of taking the medication, other than known side effects, which cannot be the basis for damages. Nor have Plaintiffs adduced evidence that the emotional distress from the fear of unknown side effects is tantamount to bodily harm or that there is a reasonable probability that harmful side effects of the antiretroviral medication will occur in the future.

---

[7] The Court acknowledged that the "single-controversy doctrine" would not bar a plaintiff who later developed a disease from an opportunity to assert that claim "when the disease occurs." <u>Id.</u> at 266.

Therefore, Plaintiffs are not entitled to receive emotional distress damages for fear of purely speculative side effects of conventional medication administered to prevent infections of HIV.

The motion to limit damages and bar expert testimony will be granted.

**V. Conclusion**

Corporate Defendants' motion for summary judgment will be granted as to the claim for negligent hiring and denied for all other claims brought by Plaintiffs. Defendant Ventura's motion, and corporate Defendants' cross-motion, to limit Plaintiffs' damages for emotional distress to the one-year window of anxiety will be granted as to both Plaintiffs Cheryl and Marie Denisco. Expert testimony related to the emotional distress suffered by Cheryl and Marie likewise will be limited to the one-year window of anxiety. An accompanying Order will be entered.


**January 15, 2013**                          **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              Chief U.S. District Judge